**Electronically Filed
Intermediate Court of Appeals
30138
09-DEC-2010
09:18 AM**

NO. 30138

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
JOHN C. VEIKOSO, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 09-1-0194)

MEMORANDUM OPINION
(By:  Fujise, Presiding Judge, Leonard and Ginoza, JJ.)

Defendant-Appellant John C. Veikoso (**Veikoso**) appeals
from the Judgment of Conviction and Sentence entered by the
Circuit Court of the First Circuit (**Circuit Court**) on September
28, 2009.[1/]  Veikoso was convicted, as charged, of the following
offenses:  (A) Sexual Assault in the First Degree in violation of
Hawai'i Revised Statutes (**HRS**) § 707-730 (1993 Repl. & Supp.
2009) (Counts 1, 2, 4, and 5); (B) Kidnapping in violation of HRS
§ 707-720 (1993 Repl. & Supp. 2009) (Counts 3 and 8); and (C)
Sexual Assault in the Third Degree in violation of HRS § 707-732
(1993 Repl. & Supp. 2009) (Counts 6 and 7).  The Circuit Court
imposed twenty-year terms of imprisonment for each of Counts 1-5
and 8, and five-year terms for each of Counts 6 and 7.  Counts 1
through 3 are to run concurrently with each other but consecutive
to the ten-year sentence imposed in another case, Cr. No. 08-1-
1578, involving a Place to Keep Firearms violation.   Counts 4

---

[1/]    The Honorable Steven S. Alm presided.

through 8 are to run concurrently with each other but consecutive to Counts 1 through 3.

On appeal, Veikoso argues that the Circuit Court erred in: (1) denying his Motion for Severance of Charges; (2) failing to obtain a voluntary, knowing, and intelligent waiver of his right to testify; (3) admitting expert testimony of the complainant's examining physician that his medical findings were consistent with a sexual assault; (4) admitting the expert witness's hearsay testimony regarding threats Veikoso allegedly made to the complainant; and (5) imposing consecutive sentences totaling fifty years, including the sentencing in 08-1-1578.

As discussed below, we conclude that the Circuit Court did not err in denying Veikoso's severance motion, obtaining a valid waiver of Veikoso's right to testify, or admitting the expert witness's opinion testimony regarding his medical findings. However, the Circuit Court erred in allowing the State's expert witness to present hearsay testimony regarding threats Veikoso allegedly made to the complainant. Because the hearsay statements were not "reasonably pertinent to diagnosis or treatment," they are not admissible under the hearsay exception for statements made for purposes of medical diagnosis or treatment. Hawai'i Rules of Evidence (**HRE**) Rule 803(b)(4). Given the centrality of the complainant's credibility with regard to Counts 4 through 8, we cannot conclude that this error was harmless beyond a reasonable doubt. We therefore vacate and remand for a new trial on those counts.

I.    BACKGROUND

On February 11, 2009, Veikoso was charged in an eight-count indictment for the sexual assaults and kidnappings of Complaining Witness #1 (**CW #1**) and Complaining Witness #2 (**CW #2**). Counts 1 through 3 pertained to events stemming from January 18, 2009, concerning CW #1. Counts 4 through 8 stemmed from events on February 7th, 2009, concerning CW #2. Both

complainants alleged that Veikoso beat, threatened, and raped them utilizing a distinct modus operandi.

A.    CW #1's Testimony

At trial, CW #1 testified that in the early morning of January 18, 2009, she was working as a prostitute near the Pali Longs Drug Store in Honolulu.  Veikoso drove by several times before soliciting her for a "date."  CW #1 agreed to a price of "200" and voluntarily entered his truck.  Shortly thereafter, Veikoso began striking her and asked if she had ever been raped. CW #1 pulled herself onto the window frame and began kicking at Veikoso while he tried to pull her back into the truck.  At one point, her foot became wedged against the passenger-side rearview mirror as her heel "went through it."

As Veikoso drove along the Pali Highway toward the Pali Lookout, CW #1 "let go" or "fell" out of the truck.  She hit her head on the road, felt her collarbone break, and sustained severe road rash.  She attempted to flee, but Veikoso retrieved her and dragged her back to his truck.  He "slapped [CW #1] around a few times" and told her that if she didn't do what he said, he was "going to kill [her]."  Along the ride from the Pali Lookout toward the Windward side, Veikoso forced her to perform oral sex on him.

Veikoso then took CW #1 to Maunawili Elementary School. CW #1 said she was thirsty, and Veikoso took her to a water basin, allowed her to drink, and washed some of the blood off her face.  CW #1 could not physically walk, but Veikoso attempted to drag her to a particular bench or picnic table at the school. Eventually, however, he threw her against the driver's side door of the truck.  He told her to do as he said or "he wasn't going to let [her] go."  Veikoso told CW #1 she wasn't the "first one," but was "number six or number seven."  Veikoso then forced her to perform oral and vaginal sex.  CW #1 believed that if she didn't

comply, he would kill her or let her die. Veikoso ejaculated on CW #1's sweater, and she rolled it up to preserve the evidence.

Veikoso then smoked a cigarette and gave one to CW #1. He remarked, "I can't believe you jumped out of the car." His demeanor seemed "kind of frantic," and he said, "[M]aybe I should just take you to my house or whatever and clean you up." CW #1 pleaded with him to take her to a hospital as she had been bleeding from her head for several hours, she could barely walk, and her arm "was just hanging." Veikoso placed a lava-lava or sarong over her legs to catch the blood and drove her to Tripler Hospital. He asked her, "You're not going to tell anybody, right?" At the hospital, he helped CW #1 get out of the truck and walked her halfway up to the gate. CW #1 was treated for her injuries and had a forensic kit completed.

CW #1 later identified the truck with the broken side mirror that her heel had kicked. The State's expert determined that blood stains on the seat belt and buckle of the vehicle matched CW #1's DNA profile. Semen stains on CW #1's sweater and lava-lava matched Veikoso's DNA profile.

B.    Chad Ogawa's Testimony

Chad Ogawa (**Ogawa**) was the first witness to testify regarding the February 7, 2009 incident. Early that day, he was driving past the Maunawili Elementary School when CW #2 "came running up to [him] to [his] car and asked [him] for help." CW #2 appeared "kinda frantic." Ogawa observed that CW #2's blouse was ripped and she had some blood on her lip. CW #2 told him "she just got raped at the school right across the street."

CW #2 got into Ogawa's car, and they drove to the parking lot behind the school. CW #2 pointed out Veikoso and his car. Ogawa took down the license plate number on his phone.

Ogawa then drove CW #2 to a 7-Eleven or Aloha gas station where his classmate, an employee at the store, called 911

and placed a report. Ogawa testified that he did not place the call himself because he had an outstanding traffic warrant.

C.   Dr. Wayne Lee's Testimony

The State's expert witness, Dr. Wayne Lee (**Dr. Lee**), testified second as to the incident concerning CW #2. He was received as an expert "in the general field of medicine, the field of general surgery, and as an expert in the examination and treatment of sex assault victims or persons alleging sexual assault." Dr. Lee completed a three-hour examination of CW #2 at the Kapiolani Women's and Children's Medical Center's Sex Abuse Treatment Center. The examination occurred about eight hours after the alleged assault. The purpose of the examination was "to examine the patient for any injuries that might need medical attention and also to gather forensic evidence."

As part of the examination, Dr. Lee obtained an incident history from CW #2. He related that CW #2 had told him: the assailant hit her several times; he grabbed her and pulled her out of the car; he kissed her and spat in her mouth; and he penetrated her vaginally and orally. CW #2 told Dr. Lee that she performed oral sex because "I didn't want to say anything. I was scared and didn't want to get hit again." Dr. Lee reiterated, "Those were her words as to why she did it."

Dr. Lee then asked CW #2 "if there were any threats involved." CW #2 allegedly told him, "[Veikoso] said he -- I wouldn't be going home if I didn't do what he told me to do. He said he would shoot me. . . . He said I'll be lucky to be going home today." Dr. Lee further testified, "'He said he would shoot me. He said I'd be lucky to go home today because most girls don't go home,' is what [CW #2] said to me that [Veikoso] had said." Veikoso objected to this line of questioning.

During the physical examination, Dr. Lee found recent abrasions on the right side of CW #2's neck and right thigh. He found a two-centimeter hematoma on the back of her head. CW #2

had pain, but no marks, on her right shoulder, at the bridge of her nose, and in the cheek bone area. Dr. Lee also observed a red, swollen lip and multiple contusions and abrasions on her body that were recent in nature.

In his pelvic examination of CW #2, Dr. Lee observed some redness on her external genitalia, indicating "that recently there was some irritation there." However, there were no breaks in the skin. He also discovered a loose black hair, which did not match CW #2's hair color. Dr. Lee opined that the examination was consistent with vaginal penetration.

On redirect examination, Dr. Lee testified that someone can strike another person without leaving physical marks or injuries. He opined that a lack of physical injuries does not rule out an assault. He further testified that a lack of physical injuries in the genital area does not rule out sexual assault because "[i]n my experience, as many as one half would have no physical injuries at all, of people who present themselves as sex assault victims that I see." He explained various reasons why injuries may not be apparent.

D.    CW #2's Testimony

CW #2 testified that in the early morning hours of February 7, 2009, she was "down at Nuuanu, behind the Pali Longs, Safeway." Before she encountered Veikoso, she had engaged in sex for a fee with one other man. Veikoso drove up to CW #2 in a Ford Mustang. He asked CW #2 if she wanted to "cruise with him," and she agreed. Veikoso stated he was driving his cousin's car. Veikoso began driving up the Pali Highway. He told CW #2, "I can take you back if you're scared. . . . I can go get somebody else. If you want to go back, just tell me." CW #2 told him, "I don't mind. We can go hang out." Veikoso turned into a dark neighborhood on Old Pali Road and reiterated that he could take her home if she was scared. CW #2 finally stated, "Okay already. . . . Just take me back already." Veikoso responded, "Oh, why?

Are you scared of me now?" CW #2 reached for her phone, but Veikoso grabbed it from her and began striking her in the face. He yanked her hair down toward the middle console, and CW #2 could see blood dripping from her face onto the console. Veikoso told her, "[Y]ou're going to do what I tell you to do." CW #2 thought she was going to die. She screamed, "Let me go, let me go." Veikoso told her, "Shut the fuck up or I'm going to shoot you." After that, CW #2 "stayed quiet" so that "he wouldn't hurt [her] anymore." Veikoso continued driving, heading over the Pali Highway.

As Veikoso's vehicle headed down the windward side of the Pali Highway, Veikoso told CW #2 he would let her go at a nearby bus stop and give her money to catch a bus home. However, he continued to drive, turning into the Maunawili area. CW #2 offered to give Veikoso the $120 she had on her if he let her go. Veikoso took the money, then stated, "[Y]ou can have it back after we're done." However, he never returned the money.

Veikoso told CW #2, "The last girl that was with me got out, but she broke her collarbone." They continued driving through a dark stretch of Maunawili, and Veikoso said, "Oh, it's scary back here, yeah? Do you know where you are?" He turned into Maunawili Elementary School and told her, "[Y]ou can tell your friends this is where you got fucked." He then turned off the car and said, "[Y]ou're going to do whatever I want you to do and then you can go; You'll be fine if you do it."

Veikoso pulled CW #2 out of the car by her hair and took her to a bench at the school. There, he forced her to perform oral and vaginal sex. CW #2 believed that if she didn't comply, "he was either going to hurt [her] again or kill [her]." Veikoso kissed her, bit her lip, and spat inside her mouth.

Afterward, Veikoso said, "I'll give you your cell phone back; just come with me back to my car." CW #2 told him she would meet him "on the side." CW #2 then walked quickly toward

the parking lot, and when she reached the sidewalk, began running toward the highway. She attempted to flag down several cars on the highway, and eventually Ogawa stopped. CW #2 told Ogawa that somebody had just raped her across the street. From this point forward, CW #2's testimony was largely consistent with Ogawa's version of what happened.

The State's expert determined that blood samples taken from the Ford Mustang matched CW #2's DNA profile. The expert also detected semen in CW #2's vaginal swabs, but did not detect any male DNA. The expert was unable to obtain a DNA profile from the black hair recovered from CW #2. The DNA profiles obtained from CW #2's secretion swabs excluded Veikoso.

E.    Motion for Severance of Charges

On May 6, 2009, Veikoso filed a Motion for Severance of Charges. He urged the Circuit Court to sever Counts 1 through 3 (involving CW #1) from Counts 4 through 8 (involving CW #2). Veikoso argued that a single trial would heighten the risk that a jury would convolute the facts of the two incidents and that it would preclude him from testifying as to the second incident. He argued that such prejudice would "far outweigh[] any judicial economy concerns."

The Circuit Court denied the motion, concluding:

4.    The allegations against Defendant demonstrate a common intent, scheme, plan, design or modus operandi.
5.    Defendant will not benefit from severance as the charged offenses are based on two similar acts.
6.    Defendant has not articulated adequate grounds for severance to tip the balance between possible prejudice to the defendant (if any exist) against the public interest in efficient use of judicial time through joint trial of these offenses.

At the close of the State's case, Veikoso renewed his Motion for Severance, arguing that he wanted to testify as to the second set of charges but not the first. The Circuit Court again denied the motion.

F.    *Tachibana* Colloquies

Prior to trial, at a hearing on various motions *in limine*, the Circuit Court advised Veikoso of his rights as follows:

> THE COURT:  And as far as the question of testifying, you have a constitutional right to testify in your own defense. And although you should consult with your attorney, Mr. Guerrero, regarding the decision to testify, it is your decision and no one can prevent you from testifying, if you choose to do so.  If you decide to testify, the prosecutor will be allowed to cross-examine you.  You also have a constitutional right not to testify and to remain silent. If you choose not to testify, the jury will be instructed that it cannot hold your silence against you in deciding your case.  And if you have not testified by the end of the trial, I will briefly question you at that point to make sure that it was your decision not to testify.
>         Do you understand that?
> THE DEFENDANT:  Yes.
> THE COURT:  Do you have any questions about it?
> THE DEFENDANT:  No.
> THE COURT:  Okay.  And as far as the -- you know, what rules we come up with today, you know, that may be the way it is when we start.  Things could change during the trial.  And this is something for you to talk to Mr. Guerrero about because even initial rulings can get changed if something happens.  Like, for instance, I don't know if you have any prior convictions, but if you had any, say, just for example, if you took the stand and you told the -- as part of your testimony, you said I've never been in trouble with the law before, if that was not accurate, the prosecutor would probably ask to approach the bench and say Mr. Veikoso is giving the jury a false impression of things.  So he'd want to bring in any record that you might have.
> THE DEFENDANT:  Yes.
> THE COURT:  So even though at the beginning perhaps, you know, if you did have a record, your attorney would be asking that none of it be included because the jury shouldn't be considering that to decide whether you committed these offenses.
> THE DEFENDANT:  Yes.
> THE COURT:  And even though that may be the ruling when we start, that can get changed based on what people say or what they do.  So, I'm just giving you that as an example that once we're done with today, it will give you an idea of what the preliminary rulings are on regarding the evidence, but that is all subject to change depending on what happens in the case, okay?
> THE DEFENDANT:  Yes.

At the close of the State's case, Veikoso renewed his Motion for Severance and made an offer of proof as to his testimony with respect to CW #2.  The Court again advised him of his rights:

9

THE COURT: Mr. Veikoso, as I discussed with you at the start, before the trial started, you have a Constitutional right testify -- to testify in your own defense.
THE DEFENDANT: Yes.
THE COURT: And although you should consult with your lawyer regarding the decision to testify, it is your decision, and no one can prevent you from testifying, if you choose to do so. If you do decide to testify, the prosecutor will be allowed to cross-examine you.
       You also have a constitutional right not to testify and to remain silent. If you choose not to testify, the jury will be instructed that it cannot hold sour [sic] silence against you in deciding your case. Now, based on what your attorney has just said, he's telling me that you do not intend to testify; is that correct?
THE DEFENDANT: Yes.
THE COURT: And is it your decision not to testify?
THE DEFENDANT: Yes.
THE COURT: And you've had a chance to discuss this with your attorney, Mr. Guerrero?
THE DEFENDANT: Yes.
THE COURT: Do you have any questions for me about that?
THE DEFENDANT: No.

Veikoso did not testify at trial and was convicted on all counts. On October 28, 2009, Veikoso filed a timely appeal.

II.   POINTS OF ERROR

Veikoso raises five points of error on appeal:

(1)   The Circuit Court erred in denying Veikoso's Motion for Severance of Charges;

(2)   The Circuit Court erred in failing to obtain a voluntary, knowing, and intelligent waiver of Veikoso's right to testify;

(3) The Circuit Court erred in admitting Dr. Lee's opinion testimony that his medical findings were consistent with sexual assault;

(4)   The Circuit Court erred in admitting Dr. Lee's hearsay testimony regarding Veikoso's alleged threats; and

(5)   The Circuit Court erred in sentencing Veikoso to consecutive terms of imprisonment totaling fifty years.

III. STANDARDS OF REVIEW

We review the Circuit Court's ruling on the Motion for Severance under the abuse of discretion standard. State v. Timas, 82 Hawai'i 499, 512, 923 P.2d 916, 929 (App. 1996).

Because Veikoso for the first time on appeal contends that his waiver of his right to testify was not knowing or voluntary, the issue is reviewed for plain error. <u>See</u> Hawai'i Rules of Penal Procedure (**HRPP**) Rule 52(b); <u>State v. Staley</u>, 91 Hawai'i 275, 282, 982 P.2d 904, 911 (1999).

"[W]here the admissibility of evidence is determined by application of the hearsay rule, there can be only one correct result, and the appropriate standard for appellate review is the right/wrong standard." <u>State v. Moore</u>, 82 Hawai'i 202, 217, 921 P.2d 122, 137 (1996) (internal quotation marks and citation omitted). With respect to hearsay exceptions, "the only question for the trial court is whether the specific requirements of the rule were met, so there can be no discretion." <u>State v. Ortiz</u>, 91 Hawai'i at 189, 981 P.2d at 1135 (internal quotation marks, citation, footnote, and brackets omitted).

Where the trial court errs in admitting evidence, "a defendant's conviction will not be overturned if the error was harmless beyond a reasonable doubt." <u>State v. Haili</u>, 103 Hawai'i 89, 100, 79 P.3d 1263, 1274 (2003). "In applying the harmless-beyond-a-reasonable-doubt standard, the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." <u>State v. Kassebeer</u>, 118 Hawai'i 493, 505, 193 P.3d 409, 421 (2008) (internal quotation marks and citation omitted).

"The authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed." <u>State v. Reis</u>, 115 Hawai'i 79, 83, 165 P.3d 980, 984 (2007) (internal quotation marks and citation omitted).

IV.  DISCUSSION

A.  Severance

Veikoso argues that the Circuit Court erred in denying his Motion for Severance of Charges.  HRPP Rule 8(a) provides that two or more offenses may be joined in one charge when the offenses:  "(1) are of the same or similar character, even if not part of a single scheme or plan; or (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan."  Here, the Circuit Court found that the charged offenses "demonstrate a common intent, scheme, plan, design or modus operandi" and that they "are based on two similar acts."

Veikoso does not dispute the propriety of the joinder under HRPP Rule 8(a), but rather the Circuit Court's appraisal of prejudice under HRPP Rule 14.  Joinder may result in prejudice to the defendant by:  "(1) preventing him or her from presenting conflicting defenses or evidence with respect to each charge, (2) permitting the prosecution to introduce evidence that would be inadmissible with respect to certain charges if tried separately, or (3) bolstering weak cases through the cumulative effect of the evidence."  State v. Cordeiro, 99 Hawai'i 390, 411, 56 P.3d 692, 713 (2002).  HRPP Rule 14 offers discretionary relief from a prejudicial joinder:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in a charge or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

In ruling on a motion for severance, the trial court must "balance the possible prejudice to the defendant from joinder with the public interest in efficient use of judicial time through joint trial of defendants and offenses which are connected."  Timas, 82 Hawai'i at 512, 923 P.2d at 929 (internal quotation marks and citation omitted).  Ultimately, "[t]he

decision to sever is in the sound discretion of the trial court."
State v. Balanza, 93 Hawai'i 279, 290, 1 P.3d 281, 288 (2000).

In reviewing a ruling on severance, we "may not
conclude that the defendant suffered prejudice from a joint trial
unless [we] first conclude that a defendant was denied a fair
trial.  What might have happened had the motion for severance
been granted is irrelevant speculation."  Timas, 82 Hawai'i at
512, 923 P.2d at 929 (ellipsis and brackets omitted) (quoting
State v. Gaspar, 8 Haw. App. 317, 327, 801 P.2d 30, 35 (1990)).
"The defendant has the burden of proving a denial of a fair
trial."  Timas, 82 Hawai'i at 511, 923 P.2d at 928.
Veikoso argues that he was denied a fair trial because the
joinder resulted in a "spillover effect" between the two
incidents, heightening the risk that the jury would convolute the
facts and convict on both sets of counts.  Veikoso asserts that
had the cases been tried separately, the State would not have
been permitted to present evidence of the offenses against a
different complainant.

We disagree.  Evidence of the other offenses would
likely have been admissible to show modus operandi and identity.
See HRE Rule 404(b).  Both incidents involved targeting
prostitutes in the Pali Longs area, beating them while driving
along the Pali Highway, threatening and frightening them into
submission, sexually assaulting them in a similar manner at
Maunawili Elementary School, and abruptly changing his demeanor
to reflect caring and concern following the assaults.  These
"characteristics and methodology" of the two incidents are so
"strikingly similar . . . as to support the inference that both
were the handiwork of the very same person."  Commentary to HRE
Rule 404; see State v. Yamada, 116 Hawai'i 422, 436-37, 173 P.3d
569, 583-84 (App. 2007) (evidence of subsequent assault and
robbery admissible to show identity and modus operandi where both
incidents involved startling the complainants in the Diamond Head

13

area, overpowering them with violence, and utilizing an aluminum baseball bat). Thus we reject the argument the joinder allowed the State to present evidence that would have been inadmissible in separate trials.[2]

Veikoso also argues that he did not receive a fair trial because he was unable to testify about his defense to CW #2's allegations without subjecting himself to cross-examination regarding CW #1's allegations.[3] In his offer of proof, Veikoso proposed to testify that CW #2 agreed to sex for a fee, that he refused to pay her, and "that's when the problem arose." He maintains that this defense conflicted with his defense for the CW #1 incident, lack of proof beyond a reasonable doubt. He argues that his proposed testimony as to CW #2 would harm his defense of reasonable doubt as to CW #1, thereby resulting in prejudice.

---

[2] Even assuming arguendo that evidence of the other offenses would be inadmissible in separate trials, the Hawai'i Supreme Court has recognized that "[c]onsolidated trials will almost always permit the admission of some evidence that would not be admissible with respect to each and every one of the charges if tried separately." Cordeiro, 99 Hawai'i at 413, 56 P.3d at 715. Although some prejudice may result, it "may be effectively dispelled by a jury instruction to the effect that 'each count and the evidence that applies to that count is to be considered separately.'" Id. (citation omitted). Here, the Circuit Court instructed the jury to consider each count separately, emphasizing, "The fact that you may find the defendant not guilty, or guilty of one of the counts charged, does not mean that you must reach the same verdict with respect to any other count charged." The court appropriately limited any prejudicial effect of CW #2's testimony concerning Veikoso's statement that "the last person to jump out of the car got a broken collarbone." It specifically instructed the jury, at the close of the State's direct examination of CW #2, that it should only consider the statement with regard to "this particular incident, with this particular witness." Because juries are presumed to follow all of the trial court's instructions, the Circuit Court effectively dispelled any prejudicial effect arising from the overlapping evidence. Montalvo v. Lapez, 77 Hawai'i 282, 301, 884 P.2d 345, 364 (1994) (citation omitted). Veikoso has presented no evidence to doubt that "the jury was able to assess the credibility of the witnesses and weigh the evidence in each case without reference to the others." Cordeiro, 99 Hawai'i at 413, 56 P.3d at 715. Veikoso has not demonstrated he was denied a fair trial on this basis.

[3] As discussed below, we find no support for Veikoso's assertion that he was prevented from testifying on his own behalf. The record indicates he exercised his right not to testify as a matter of strategy.

In describing the "conflicting defenses" ground for prejudice, this court stated that a consolidated trial may have been unfair if "the core of each defense was in irreconcilable conflict with the other and there was a significant danger, as both defenses were portrayed in the trial, that the conflict alone led the jury to infer the defendant's guilt." Gaspar, 8 Haw. App. at 327, 801 P.2d at 35. Here, we fail to see how Veikoso's two proposed defenses are conflicting. To the contrary, they are by no means mutually exclusive. In his closing argument, Veikoso utilized both defenses with regard to both CW #1 and CW #2. As the court did in Gaspar, we decline to speculate as to how Veikoso's testimony may have shaped his defenses had he taken the stand. "The only relevant facts are what actually happened." Id. at 328, 801 P.2d at 36. We are unpersuaded that the joinder prevented Veikoso from testifying, thereby resulting in an unfair trial.

Finally, Veikoso argues that the joinder allowed the State to "bolster its weaker case [regarding CW #2] through the cumulative effect of the evidence of both complainants." Upon review of the record, we cannot conclude that the State's evidence regarding CW #2 was sufficiently weak, if at all, as to deny Veikoso a fair trial. Although CW #2's allegations, unlike CW #1's, were not supported by DNA evidence, both complainants' testimonies were critical to their credibility and hence their respective allegations. Furthermore, as discussed above, the jury is presumed to follow the trial court's instructions. The Circuit Court's instructions dispelled any potential "cumulative effect" of the evidence. Thus Veikoso has failed to demonstrate that he was denied a fair trial as a result of the joinder.

B.   Waiver of Veikoso's Right to Testify

Veikoso argues that the Circuit Court failed to obtain a voluntary, knowing, and intelligent waiver of his right to

testify. Because Veikoso failed to properly preserve the issue for appeal, we review for plain error. HRPP Rule 52(b).

The accused's right to testify in criminal prosecutions is guaranteed by both the federal and state constitutions. U.S. Const. amend. V, XIV; Haw. Const. art. I, §§ 5, 10, 14; State v. Silva, 78 Hawai'i 115, 122-23, 890 P.2d 708, 709-10 (App. 1995), abrogated on other grounds by Tachibana v. State, 79 Hawai'i 226, 900 P.2d 1293 (1995)). Trial courts must advise criminal defendants of their rights and obtain an on-the-record waiver in every case where the defendant does not testify. Tachibana, 79 Hawai'i at 237, 900 P.2d at 1304. The trial court must inform the defendant that: (1) he has the right to testify; (2) if he wants to testify, no one can prevent him from doing so; (3) if he testifies, the prosecution will be allowed to cross-examine him; (4) he has a right not to testify; and (5) if he does not testify, the jury will be instructed that it cannot hold his silence against him. Id. at 236 n.7, 900 P.2d at 1303 n.7. These advisements should take place before trial and must be reiterated before the defense rests. Id. at 237, 900 P.2d at 1304.

Veikoso first argues that the Circuit Court failed to obtain a valid waiver of his right to testify in its pretrial Tachibana colloquy. He claims the waiver was tainted by the Circuit Court's discussion of possible cross-examination scenarios, which had the effect of discouraging him from testifying. After delivering the required colloquy, the Circuit Court further explained:

> THE COURT: Okay. And as far as the -- you know, what rules we come up with today, you know, that may be the way it is when we start. Things could change during the trial. And this is something for you to talk to Mr. Guerrero about because even initial rulings can get changed if something happens. Like, for instance, I don't know if you have any prior convictions, but if you had any, say, just for example, if you took the stand and you told the -- as part of your testimony, you said I've never been in trouble with the law before, if that was not accurate, the prosecutor would probably ask to approach the bench and say Mr. Veikoso

```
is giving the jury a false impression of things.  So he'd
want to bring in any record that you might have.
THE DEFENDANT:  Yes.
THE COURT:  So even though at the beginning perhaps, you
know, if you did have a record, your attorney would be
asking that none of it be included because the jury
shouldn't be considering that to decide whether you
committed these offenses.
THE DEFENDANT:  Yes.
THE COURT:  And even though that may be the ruling when we
start, that can get changed based on what people say or what
they do.  So, I'm just giving you that as an example that
once we're done with today, it will give you an idea of what
the preliminary rulings are on regarding the evidence, but
that is all subject to change depending on what happens in
the case, okay?
THE DEFENDANT:  Yes.
```

Veikoso argues that because he had a pending firearm offense, this warning effectively discouraged him from testifying.

The court in Tachibana recognized the delicacy of requiring trial courts to advise defendants of their rights.  79 Hawaiʻi at 242-43, 900 P.2d at 1309-10.  In so doing, the trial court runs the risk of implicitly emphasizing certain rights over others.  For example, "in explicating the right to testify," the trial judge risks "cast[ing] in unflattering light the right not to testify."  Id. at 243, 900 P.2d at 1310 (citation omitted). The court carefully crafted the specific elements of the Tachibana colloquy to avoid any such undue emphasis.  Id. at 236 n.7, 900 P.2d at 1303 n.7.  It therefore mandated that "[i]n conducting the colloquy, the trial court must be careful not to influence the defendant's decision whether or not to testify and should limit the colloquy to [the five elements]."  Id.

Here, by engaging in a discussion of the potential consequences of testifying, the Circuit Court ventured somewhat beyond the colloquy in Tachibana.  See, e.g., Webb v. Texas, 409 U.S. 95, 98 (1972); Arthur v. United States, 986 A.2d 398, 403-04 (D.C. App. 2009).  Thus, we must determine whether the Circuit Court's remarks effectively precluded the defendant from exerting a valid waiver of his right to testify.  To determine whether such a waiver is voluntary, knowing, and intelligent, we must

examine the totality of facts and circumstances. State v. Merino, 81 Hawai'i 198, 221, 915 P.2d 672, 695 (1996).

At the close of the State's case, the Circuit Court repeated the Tachibana colloquy without detailing the possible consequences of testifying. The court specifically clarified that it was Veikoso's own decision not to testify. Veikoso was represented by counsel throughout the proceedings and had the opportunity to discuss the decision with his attorney. Although his counsel previously stated that Veikoso wished to testify to refute CW #2 but not CW #1, the record indicates his ultimate choice not to testify was a matter of strategy and not because of undue pressure by the judge. Based on the totality of facts and circumstances, we conclude that Veikoso knowingly, voluntarily, and intelligently waived his right to testify.

C.    Dr. Lee's Opinion re Sexual Assault

Veikoso argues that the Circuit Court erred by allowing Dr. Lee to opine that his medical findings were consistent with sexual assault. He maintains that the testimony had the improper prejudicial effect of bolstering CW #2's credibility. Because Veikoso failed to object at trial, we review for plain error. HRPP Rule 52(b).

Veikoso points to State v. Morris, 72 Haw. 527, 825 P.2d 1051 (1992), to support his contention of error. In that child abuse case, the expert witness opined that the child suffered chronic abuse. Id. at 528-29, 825 P.2d at 1052. However, the witness had never examined the child and there was no physical evidence to support his opinion. Id. at 529, 825 P.2d at 1052. The court concluded that the "clear implication" of the expert's testimony was to "say that the child [was] truthful" without any factual basis. Id. Here, in contrast, Dr. Lee based his opinion on a thorough examination of CW #2. He did not base his testimony on facts not in evidence. Thus Morris is not on point.

Veikoso's reliance on another child abuse case, <u>State v. Batangan</u>, is likewise misplaced. 71 Haw. 552, 799 P.2d 48 (1990). There, the court held that "conclusory opinions that abuse did occur and that the child victim's report of abuse is truthful and believable is of no assistance to the jury, and therefore, should not be admitted." <u>Id.</u> at 558, 799 P.2d at 52. The expert witness in that case "implicitly testified" that the complainant "was believable and that she had been abused by [the defendant]." <u>Id.</u> at 555, 799 P.2d at 50. Here, however, Dr. Lee did not implicitly testify as to CW #2's believability. He merely testified that his findings did not "rule out" sexual assault.

In a case addressing this very issue, an expert witness testified that a lack of physical trauma was consistent with the complainant's allegations of assault. <u>State v. Mars</u>, 116 Hawai'i 125, 140, 170 P.3d 861, 876 (App. 2007). This court concluded that although it is improper to admit expert opinion testimony that "directly addresses the credibility of the victim, i.e., 'I believe the victim,'" it is proper to admit testimony that medical findings are "consistent with" the complainant's account. <u>Id.</u> at 140, 170 P.3d at 876 (internal quotation marks and citation omitted). Here, where substantially similar testimony is at issue, we conclude that the Circuit Court did not plainly err in admitting Dr. Lee's opinion testimony.

D.    <u>Dr. Lee's Testimony re Veikoso's Threats</u>

Veikoso contends that the Circuit Court erred by admitting Dr. Lee's hearsay testimony regarding threats Veikoso allegedly made to CW #2. During the course of his examination of CW #2, Dr. Lee asked her "if there were any threats involved." Over Veikoso's objection, Dr. Lee testified as follows:

> THE WITNESS [Dr. Lee]: And [CW #2] said she was -- she said she was scared, to me, and, quote, He said he -- I wouldn't be going home if I didn't do what he told me to do. He said he would shoot me.
> . . . .

THE WITNESS [Dr. Lee]:  He said I'll be lucky to go home today.
. . . .
Q. BY MR. CHIN [Prosecutor]:  Okay.  You were interrupted [by Veikoso's objection].  But what were the -- what were the type of statements that were being made that you were just talking about?
A.  Well, she told me, He said he would shoot me.  He said I'd be lucky to go home today because most girls don't go home, is what she said to me that he had said.

The Circuit Court overruled Veikoso's objection and admitted the testimony under the hearsay exception for statements made for purposes of medical diagnosis or treatment under HRE Rule 803(b)(4).

HRE Rule 803(b)(4) allows admission of:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Hawaiʻi courts have not fully developed the reach of this exception in the context of sexual assault.  Other courts generally admit hearsay statements describing the physical nature of the assault, as such statements pertain to the "cause or external source" of the injuries.  See, e.g., Guam v. Ignacio, 10 F.3d 608, 613 (9th Cir. 1993).  Under this reasoning, the physician's ability to treat the complainant's injuries is dependent upon a description of how they arose.  Id.  Here, Dr. Lee's testimony regarding CW #2's description of the physical aspects of the assault was admissible under this reasoning.

With regard to statements assigning fault, it appears that courts have tended to adopt either a broad or narrow interpretation of this hearsay exception.  However, as discussed below, even courts employing the broad interpretation generally do not admit statements describing alleged threats the defendant made to the complainant.

Under the narrower interpretation, courts will not admit hearsay statements pertaining to fault.[4] In jurisdictions employing this interpretation, statements assigning fault, including those regarding the identity of the assailant, generally are not admissible. See, e.g., United States v. Belfast, 611 F.3d 783, 819 (11th Cir. 2010); Storms v. Storms, 454 N.W.2d 175, 178 (Mich. Ct. App. 1990); In re Marriage of P.K.A., 725 S.W.2d 78, 80 (Mo. Ct. App. 1987); State v. Robinson, 718 N.W.2d 400, 404-07 (Minn. 2006).

Under the broader interpretation, courts appear to be more willing to admit hearsay statements assigning fault and, in domestic or child abuse situations, the assailant's identity. See, e.g., State v. Rosa, 575 A.2d 727, 729-30 (Me. 1990) (physician's testimony that complainant told him the assailant threatened her with a knife was pertinent when physician testified that he was treating the victim for emotional trauma); Moore v. City of Leeds, 1 So.3d 145, 150 (Ala. Crim. App. 2008) (physician's testimony regarding complainant's description of altercation with her husband that gave rise to her injuries was reasonably pertinent to medical treatment stemming from domestic violence). A number of jurisdictions have held that in child sexual abuse cases, statements identifying the abuser are admissible. See, e.g., Danaipour v. McLarey, 386 F.3d 289, 298-99 (1st Cir. 2004); Morgan v. Foretich, 846 F.2d 941, 949 (4th Cir. 1988); United States v. Balfany, 965 F.2d 575, 579 (8th Cir. 1992); United States v. George, 960 F.2d 97, 99-100 (9th Cir. 1992); Ignacio, 10 F.3d at 613; State v. Williams, 154 P.3d 322, 327-28 (Wash. Ct. App. 2007); State v. Livingston, 907 S.W.2d 392, 396-97 (Tenn. 1995); State v. DePastino, 638 A.2d 578, 585

---

[4] This approach comports with the Advisory Committee's note to Fed. R. Evid. Rule 803(4) that "[s]tatements as to fault would not ordinarily qualify." The commentary to the identical Hawai'i rule quotes the federal Advisory Committee's notes, observing that "a patient's statement that he was struck by an automobile would qualify but not his statement that the car was driven through a red light." Commentary to HRE Rule 803(b)(4).

(Conn. 1994); <u>State v. Logan</u>, 806 P.2d 137, 139-40 (Or. Ct. App. 1991); <u>Nash v. State</u>, 754 N.E.2d 1021, 1025 (Ind. Ct. App. 2001). The identity of the abuser is relevant to the child's psychological and emotional treatment, as well as his or her safety. <u>See</u> <u>United States v. Joe</u>, 8 F.3d 1488, 1494-95 (10th Cir. 1993). Several jurisdictions have extended this reasoning to domestic assault complainants, as their ongoing safety and psychological treatment depends on the identity of the abuser. <u>Id.</u> at 1495; <u>Oldman v. State</u>, 998 P.2d 957, 961-62 (Wyo. 2000); <u>United States v. Tome</u>, 61 F.3d 1446, 1450 (10th Cir. 1995); <u>Moore</u>, 1 So.3d at 150. However, in cases such as this, where the assailant is a stranger who does not maintain daily contact with the complainant, the safety rationale is inapplicable.

A handful of cases have dealt with the type of hearsay at issue in this case -- alleged threats of the assailant. The overwhelming majority have held the threats inadmissible.

In <u>United States v. Joe</u>, 8 F.3d at 1497, a physician testified that the complainant told him her husband threatened to kill her if he ever caught her with another man. The Tenth Circuit held that the testimony did not fall within the hearsay exception for medical diagnosis or treatment because it did not concern the cause of the alleged sexual assault-related injuries for which the complainant was treated. <u>Id.</u> Similarly, in the instant case, there is no testimony linking Veikoso's alleged threats to the cause or inception of CW #2's injuries.

In <u>State v. Pina</u>, 455 A.2d 313, 315 (R.I. 1983), the examining physician testified to threats the defendant allegedly made in the course of a sexual assault. The assailant allegedly threatened to kill the complainant and throw her in a river. <u>Id.</u> He also allegedly told her that he "was horny and interested in sex" and that "he was going to rape her and didn't care what happened to him." <u>Id.</u> The court considered whether such statements were "helpful in the diagnosis or treatment of [the

complainant's] ailments," and concluded they were not. Id. (quoting State v. Contreras, 253 A.2d 612, 619 (R.I. 1969)). It held that the statements were "clearly not pertinent to diagnosis or treatment," and were therefore inadmissible. Id. This interpretation of the hearsay exception was reaffirmed in State v. Burgess, 465 A.2d 204 (R.I. 1983), and State v. Gaspar, 982 A.2d 140 (R.I. 2009). In People v. Mitchell, 558 N.E.2d 559, 564 (Ill. App. Ct. 1990), an Illinois appellate court considered whether the defendant's statements during the course of a sexual assault, as told by the complainant's treating physician, were admissible under the medical diagnosis exception. Allegedly, the defendant told the complainant that if she would not go out with him, he would take what he wanted. Id. The court held that this testimony was not reasonably pertinent to the complainant's diagnosis or treatment. Id.

In Howard v. State, 403 S.E.2d 204, 204-05 (Ga. 1991), the Georgia Supreme Court considered a physician's hearsay testimony regarding the defendant's alleged threat to shoot her if she took another step. It concluded that the testimony was inadmissible because it was not reasonably pertinent to medical diagnosis or treatment. Id. at 205.

Similarly, in Casica v. State, 24 So.3d 1236, 1241 (Fla. Dist. Ct. App. 2009), the trial court erroneously admitted the hearsay statement of the complainant, related by her treating nurse, that the man who sexually assaulted her had a gun. The appellate court held that the statement was not reasonably pertinent to diagnosis or treatment. Id. Accord, State v. Hairston, 586 N.E.2d 1200, 1204 (Ohio Ct. App. 1990); see also Herrera v. State, 879 So.2d 38, 40 (Fla. Dist. Ct. App. 2004) (State conceded that alleged threat at gunpoint to rip off complainant's clothes and take nude pictures of her was not reasonably pertinent to medical diagnosis or treatment).

23

Finally, in State v. Clary, 596 N.E.2d 554, 561 (Ohio Ct. App. 1991), the Ohio Court of Appeals held that the assailant's threat against the complainant during the course of an alleged sexual assault was not admissible under the exception. It reasoned that the threat could not "effect any change in treatment or diagnosis." Id. It appears that, when the treating physician testified that he or she was inquiring for the purposes of psychological treatment or diagnosis, some courts have reached a contrary conclusion. In State v. Woods, 23 P.3d 1046, 1069-70 (Wash. 2001), the defendant went on a rampage, sexually assaulting and beating two victims to death. Before the second victim died, she told the emergency room physician that the assailant "hauled her out of bed, took her into the room where [the first victim lay badly beaten], showed [the first victim] to her and said, . . . 'if you don't do what I tell you, you are going to end up in the same condition.'" Id. at 1069. The emergency room physician testified to these statements, as well as the victim's detailed descriptions of the attacks. Id. As a foundation, the physician testified that he "needed to have an idea of what happened 'the same way the patient knows the story'" in order to arrange for psychological counseling. Id. at 1070. The court held that the statements were admissible under the medical diagnosis exception. It reasoned that they were pertinent to an assessment of the victim's potential need for psychological counseling. Id. The victim's forced viewing of the beaten body of her friend was particularly relevant to eventual psychological treatment. Id.; see also State v. Woodward, 908 P.2d 231, 238 (N.M. 1995) (psychologist's testimony that victim's husband had made various threats to kill her held reasonably pertinent to psychological treatment); Vallinoto v. DiSandro, 688 A.2d 830, 840-41 (R.I. 1997) (hearsay statements admissible where directly relevant to psychological treatment).

Here, Dr. Lee noted that the treatment center provided counseling services. However, unlike the physician in <u>Woods</u>, he did not testify that a purpose of his examination was to discern whether psychological treatment may be necessary. Rather, his examination was confined to "any injuries that might need medical attention." The whole of his testimony confirms that the examination was for physical, not psychological, diagnosis and treatment.

The Hawai'i Supreme Court has held that the HRE 803(b)(4) exception extends to statements made for the purpose of psychological treatment. <u>State v. Yamada</u>, 99 Hawai'i 542, 546-47, 556, 57 P.3d 467, 471-72, 481 (2002); <u>see also</u> <u>State v. Wakisaka</u>, 102 Hawai'i 504, 518, 78 P.3d 317, 331 (2003) (hearsay exception includes statements made for purposes of psychological treatment). The <u>Yamada</u> court held that a videotape of the defendant's "reenactment" of the events giving rise to prosecution was admissible because the reenactment was conducted to aid the treating psychologist in making a diagnosis. <u>Yamada</u>, 99 Hawai'i at 546-47, 556, 57 P.3d at 471-72, 481. Here, however, Dr. Lee did not testify that the threats were relevant to treatment or diagnosis. He only testified that obtaining a generalized "incident history" aids in the diagnosis of physical injuries. Thus, although under <u>Yamada</u>, the alleged threats could arguably be admissible if conveyed for the purpose of psychological diagnosis or treatment, no such foundation was laid here.

Accordingly, under the circumstances of this case, we conclude that Dr. Lee's testimony regarding CW #2's report of Veikoso's threats was not reasonably pertinent to medical diagnosis or treatment. The Circuit Court therefore erred in admitting the testimony under HRE Rule 803(b)(4).

To determine whether this error constituted harmless error beyond a reasonable doubt, we must "examine the record and

determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." Kassebeer, 118 Hawai'i at 505, 193 P.3d at 421 (internal quotation marks and citation omitted). "If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside." State v. Gano, 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999) (internal quotation marks and citation omitted).

Here, the hearsay statements were relayed through an expert witness, a doctor, thereby heightening their prejudicial effect. The statement concerning alleged threats went to the heart of the key witness's testimony and were not cumulative to other evidence. Several of the most damaging statements were conveyed solely through Dr. Lee's hearsay testimony. At trial, CW #2 never testified that Veikoso told her "[she'd] be lucky to go home today." Nor did she testify to his alleged threat that "most girls don't go home." The jury was thus allowed to consider evidence it should not have heard. The threats to which CW #2 did testify arguably were colored with heightened credibility as a result of Dr. Lee's improper testimony.

The hearsay testimony was highly prejudicial to Veikoso. The alleged threats were repeated several times and were presented as CW #2's own words. Moreover, in adult sexual assault cases, the credibility of the complainant is paramount. The complaining witness is critical to establishing a lack of consent, as he or she is often the sole eyewitness to what occurred. Although the State presented limited corroborating evidence from Dr. Lee and Ogawa, CW #2's credibility was still critical to establishing all five counts. Veikoso argued a defense of consent in his closing argument. He attempted to cast doubt upon CW #2's credibility on several bases: her failure to disclose to the Grand Jury that she was working as a prostitute;

her failure to disclose until the week of trial that she had sex for a fee with another man earlier that same night; her failure to report the incident immediately after it happened; and discrepancies with her Grand Jury testimony. The alleged threats, relayed in raw terms as vivid and concrete quotations and repeated several times, may have tipped the scale in favor of CW #2's credibility. We therefore conclude that there is a reasonable possibility that the error might have contributed to the conviction and we cannot conclude that the error was harmless beyond a reasonable doubt.

E. Sentencing

Veikoso contends that the Circuit Court abused its discretion in imposing consecutive sentences totaling fifty years. In determining whether to impose consecutive sentences, HRS § 706-668.5(2) directs the court to consider the factors set forth in HRS § 706-606:

>(1)    The nature and circumstances of the offense and the history and characteristics of the defendant;
>(2)    The need for the sentence imposed:
>    (a)    To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;
>    (b)    To afford adequate deterrence to criminal conduct;
>    (c)    To protect the public from further crimes of the defendant; and
>    (d)    To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>(3)    The kinds of sentences available; and
>(4)    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

(1993 Repl. & Supp. 2009).

Ultimately, the Circuit Court enjoys "broad discretion in imposing a sentence." State v. Kahapea, 111 Hawai'i 267, 278, 141 P.3d 440, 451 (2006) (internal quotation marks and brackets omitted) (quoting State v. Rauch, 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000)). We may only consider "whether the court committed plain and manifest abuse of discretion." Id.

27

The Circuit Court expressly considered factors (1), (2), and (3) from HRS § 706-606. As the State concedes, it did not specifically address "[t]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." HRS § 706-606(4). However, "[t]he fact that a court does not orally address every factor stated in HRS § 706-606 at the time of sentencing does not mean the court failed to consider those factors." State v. Sinagoga, 81 Hawaiʻi 421, 428, 918 P.2d 228, 235 (App. 1996), overruled on other grounds by State v. Veikoso, 102 Hawaiʻi 219, 227, 74 P.3d 575, 583 (2003). "Absent clear evidence to the contrary, it is presumed that a sentencing court will have considered all factors before imposing concurrent or consecutive terms of imprisonment under HRS § 706-606." State v. Tauiliili, 96 Hawaiʻi 195, 200, 29 P.3d 914, 919 (2001).

We presume that the Circuit Court considered factor (4) of HRS § 706-606, even though it did not expressly address it in oral or written findings. Veikoso has presented no evidence to refute this presumption. The court's failure to expressly address factor (4) does not amount to an abuse of discretion.

Veikoso also challenges the Circuit Court's characterization of him as a "serial rapist" and a "violent, dangerous" person. Veikoso contends that because the State is required to prove beyond a reasonable doubt that a defendant is subject to extended term sentencing as a "dangerous person" under HRS § 706-662(3), the same burden of proof should apply "where the court is essentially making a clinical determination about the defendant's mental status." We disagree. In context, the Circuit Court was not making a "clinical determination." Rather, it was considering the "nature and circumstances of the offense[s]" in accordance with HRS § 706-606(1). Veikoso's contention is therefore without merit. In any case, in light of our determination that the Circuit Court's error in admitting Dr.

Lee's hearsay testimony was not harmless error, Veikoso's conviction and sentence on Counts 4 through 8 is vacated.

V.    CONCLUSION

For the foregoing reasons, we affirm in part and vacate in part the Circuit Court's September 28, 2009 Judgment of Conviction and Sentence; we affirm as to Counts 1 through 3, and vacate and remand for a new trial on Counts 4 through 8.

DATED:   Honolulu, Hawai'i,  December 9, 2010.

On the briefs:

Joyce K. Matsumoto-Hoshijo
for Defendant-Appellant

James M. Anderson
Deputy Prosecuting Attorney
for Plaintiff-Appellee

Presiding Judge

Associate Judge

Associate Judge